Robert W. BRIGGS et al., Plaintiffs,

v.

MICHIGAN TOOL COMPANY, a Delaware corporation, et al., Defendants.

Civ. A. No. 36373.

United States District Court,
E. D. Michigan, S. D.

Jan. 22, 1974.

Philip A. Gillis, Detroit, Mich., for plaintiffs.

W. Gerald Warren, Dickinson, Wright, McKean & Cudlip, George D. Miller, Jr., Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This case involves a claim made by the plaintiff union and its members that the employer defendant Michigan Tool Company did not make payments required by the terms of the contract to a pension fund negotiated as a result of collective bargaining.

The problem is before the court on motion for summary judgment filed by both parties and a stipulation of facts. In open court the parties indicated that the merits of the matter were submitted on the stipulated facts and supporting affidavits for a decision on the merits.

The history of the pension agreement in this case shows that it was first negotiated in 1951. It was amended periodically until the last contract in 1968. Prior to 1959 the dollars to be paid into the fund were negotiated by the parties and set forth in the agreement. The amount of money thus deposited in the fund was then to be paid out to employees in accordance with a formula.

In 1959 a different concept was developed and the basic approach was reversed. The dollar benefit to employees was agreed upon by negotiation between the parties, and the employer contracted to make payments into the Trust Fund in a sufficient amount to fund the benefits provided in the plan. The specific language used in the contract is as follows:

> "The Company agrees that, during the term of this Agreement, it will make payments into the Trust Fund in amounts which shall be sufficient to fund the benefits provided hereunder on a sound actuarial basis." Article IV, Paragraph 1.

The 1959 agreement provided that it should continue in full force for a period of two years without change, and provision was made as to procedures for negotiating modification at the end of the two year period. Although subsequent amendments changed the formula for the receipt of benefits, the provision for funding was left unchanged.

The trustee of the plan was the Manufacturer's National Bank. It was administered by a Board of Administration, 3 members appointed by the company and 3 members appointed by the union. The Wyatt Company was the actuary selected to determine the actuarial soundness of the plan.

The problem before the court is created by the fact that at the time the company's operations were closed down in 1971 the fund had a $1,422,100.00 deficiency. That is, it was that sum short of providing benefits as provided in the agreement to the employees in accordance with the terms of the agreement on a sound actuarial basis.

The union contends that the company has failed to fund the benefits as required by the contract.

The company contends:

1. That it did fund the benefits as required by the contract in accordance with sound actuarial practices.

2. That its liability is limited to the amounts in the fund.

3. That the failure of the union representatives on the Board to object to the method of funding at an earlier occasion estops the union from now asserting the deficiency and makes them guilty of laches.

4. The statute of limitations has run.

In each year the Wyatt Company prepared and delivered to the Board of Administration a report of the actuarial valuation of the plan. These reports were available to both parties at all times. In every instance since the change in the type of plan in 1959 the actuaries reported a net deficiency, beginning in December, 1960, with a $604,400.00 deficiency to the First of January, 1971, with a $1,422,100.00 deficiency. This deficiency results because benefits are provided in the fund based on past service as well as based on current service and, although the company has in each instance paid into the fund an amount based upon sound actuarial practices sufficient to fund the current service, it has not paid into the fund sufficient amounts to fund the service of employees prior to the date on which benefits were established or increased. The plan used for funding of past service was to provide for funding over a thirty year period.

The actuaries had the obligation to determine the amounts required to fund the benefits provided by the contract. Based on the actuarial studies of the persons who were entitled to the benefits, and certain assumptions such as the rate of return on money, life expectancy, etc., the actuaries were required by the contract to report the number of dollars required each year to provide, at the time the benefits would become due, the amounts contracted to be paid to the employees' beneficiaries. Payment of this amount into the fund would "fund the benefits" as provided in Article IV, Paragraph 1. This is what is meant by funding.

The actuaries in this case went further. They expressed an opinion that payment into the fund of amounts which if extended over a 30 year period would be sufficient to fund the past service deficiency. The 30 year period was chosen because tax laws will permit deductions for employer contributions for payments extending no fewer than 10 years and as long as 30 years. Since contributions over 30 years made the annual payments less, the employer chose this period of time to make its payments, even though the actuarial report indicated in each instance a deficiency in the funding of benefits. The first question therefore is:

Did the employer, who made payments into the fund in an amount which only at the end of 30 years would provide sufficient money when invested properly to pay the benefits provided by the plan, based on sound actuarial principles, when they became due, conform to the requirements of the contract requiring it to fund the benefits "during the term of this agreement"?

It is the conclusion of the court that this cannot be said to be true. The employer agreed "during the term of this agreement" to fund the plan. Initially the agreement was to run two years. Up to the time it was terminated it had run 12 years. At no time during its term were there funds in the trust sufficient when invested reasonably to make payments when due to the beneficiaries. The actuaries had reported a deficiency in each of the years in which reports were made. If the parties had intended to permit funding over a period of 30 years, they could have agreed upon it. They did not. They expressly provided to the contrary making the time within which the funding was to take place "during the terms of this agreement".

It is argued by the defendant that the clause "on a sound actuarial basis" in the paragraph of the contract providing for the funding of the benefits somehow permits the company to delay funding over an extended period when recommended by the actuary.

The stipulation on which this opinion is based provides that Wyatt and Company actuaries "would opine . . . that the pension plan was maintained in accordance with the terms of the plan, and was in sound actuarial condition as of the date of alleged termination. They would base this opinion upon a 30 year funding."

This opinion is of assistance to the court in determining the soundness of the number of dollars determined by the actuary to be necessary as of a given date to provide the benefits required to be paid under the plan. It is of no help, however, to the court in determining whether the company has paid into the fund the number of dollars required by the contract to be paid.

The clause "on a sound actuarial basis" has to do with a determination of the amounts needed to pay the benefits provided in the plan. Having reported that, which the actuary did, it is up to the company under the contract to provide the dollars in accordance with the terms of the contract. In every report the actuaries reported a deficiency.

The fact that the tax laws would not permit a deduction for payments made into the fund spread over fewer than 10 years to fund benefits for past service has relevance in the final determination of this case because the contract contained a provision that clearly indicates that it was the intention of the parties that the pension fund was to be a fund meeting the standards of Sections 401, 404 and 501(a) of the Internal Revenue Code. Section 404 provides that a company may not deduct as business expense money paid into a pension fund to fund benefits for past service in excess of 10% of the cost of funding those past service benefits in a given year. This provides a 10 year minimum funding pattern for all past service benefits if the employer is to be permitted the tax deductions.

■ Because the parties contemplated that the contract should comply with the Internal Revenue Code so far as permitting the employer to deduct his payments into the fund as a business expense, the funding of the benefits for past service could extend over a period of 10 years. It is, however, improper to extend them longer than 10 years because the funding provision provides that the benefits should be funded during the term of the contract which at every renewal was to extend for a period of less than 10 years.

In summary, therefore, as part of the agreement the parties agreed, first, that this was to be a funded plan; second, the benefits were to be funded during the term of the contract; third, the term of the contract was initially two years but was extended after negotiation for three years in 1962, 1965 and 1968, being terminated by the employer on April 24, 1971; fourth, the agreement was to meet the standards of the Internal Revenue Code, which has a minimum period of 10 years for funding of past service benefits.

The court can see no merit in the other defenses of the defendant.

■ There is no doubt that the defendant has a right to terminate the contract and to relieve itself of any further liability under the contract (Article III, ¶3, and Article XII, ¶2), but it does not have the right to excuse itself from liability already accrued under the contract and for failure on its part to perform as required by the contract during the time the contract was in operation.

■ The pension fund agreement provides a limit on the liability of the employer after the contract is terminated:

"The retirement benefits provided for herein shall be only such as can be provided by the assets of the Trust Fund, and in the event of termination of this agreement, there shall be no liability or obligation on the part of the company to make any further contribution to the trustee for the purposes of this agreement or otherwise." Article III, Paragraph 3.

"There shall be no liability or obligation on the part of the company to make any further contributions to the original Trust Fund or such new Trust Fund or toward the purchase of such insurance or annuity contracts in the event of discontinuance of this agreement." Article XII, Paragraph 2.

The provisions of the contract (Article III, ¶3, and Article XII, ¶2) merely exonerate the company from continuing to make payments into the fund after its termination on the assumption that payments had been made as required by the contract prior to termination. This lawsuit is about the obligation of the employer prior to termination.

■ The union representatives have done nothing affirmative to estop them from suing to require the terms of the contract to be complied with, nor are they guilty of laches in not calling the matter to the attention of the plaintiff earlier. The suit was instituted April 12, 1971, prior to the date the contract was terminated and very shortly after notice of the closing of the plant.

■ The defendant has raised in his answer the statute of limitations as a bar to this action. The defense is inapplicable.

The parties entered into an agreement creating the pension plan on May 31, 1951. On January 1, 1959 the plan was amended to include the provision (Article IV, Section 1) which required the company to make the payments during the term of the agreement sufficient to fund the benefits provided thereunder. On September 23, 1960, the agreement was extended to December 31, 1961. On December 20, 1961, the agreement was extended to December 31, 1964. On December 16, 1964, the agreement was extended to December 31, 1967. On March 14, 1968, the agreement was extended to December 31, 1970. The funding requirement was never eliminated; rather, it was renewed each time the agreement was extended. Thus this cause of action for failure to comport with the terms of the contract arose as of that latter date, and would not be barred by the statute of limitations, M.C.L.A. 600.5807, even today.

## CONCLUSION

1. All benefits for past service provided in the contract prior to April 24, 1961 should have been fully funded at the end of 10 years from the date they were provided for in the contract. All such benefits should have been funded at the time this lawsuit was commenced.

2. All benefits for current service should have been fully funded currently by the terms of the contract.

3. The new benefits for past service provided since April 24, 1961 and the increases in benefits for past service provided since April 24, 1961 should have been funded at a rate of 10% per year.

This will not fully fund the benefits, but it will fund them at a rate consistent with the Internal Revenue Code agreed to in the contract that most nearly meets the terms of the contract of funding "during the terms of this agreement".

The parties will provide the accounting documentation and a form for judgment entry within thirty (30) days. Judgment will be entered in accordance with these standards. This documentation should utilize the same actuarial standards used to date.

So ordered.